UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

--------------------------------------------------------
                                           :

EMILY POPSON, et al.,           :        CASE NO. 3:04CV7056
                                           :

               Plaintiffs,      :

                                         :

vs.                              :        OPINION AND MEMORANDUM
                                       :        [Resolving Doc. Nos. 58 and 63]

DANBURY LOCAL SCHOOL DISTRICT,  :
et al.,                               :

              Defendants.     :

                                         :
--------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

       Defendants Danbury Local School District, *et al.*,[1] move this Court for summary judgment on all claims.  [Doc. 58].  Plaintiffs Emily, John, and Priscilla Popson filed a memorandum opposing the defendants' motion [Doc. 67], to which the defendants replied.  [Doc. 72].  The plaintiffs filed a motion to strike the affidavit of Defendant Carole Burnworth.  [Doc. 63].  The defendants opposed this motion [Doc. 69], and the plaintiffs replied.  [Doc. 74].  After considering the evidence and the applicable law, the Court **GRANTS** the defendants' motion for summary judgment, and **DENIES** the plaintiffs' motion to strike as moot.

I.  Background

---

      [1]The complaint names the following defendants: Danbury Local School District; Danbury Board of Education; Danbury School Superintendent Martin Fanning; Danbury School Board President Charles Scott; Danbury School Board members Janice Zura, Dan Dress, and Lori Chura; Danbury school principal Halley Leffler and teachers Valerie Kosa and Barb Mowry; Erie-Huron-Ottawa Educational Service Center ("SERRC"); and Educational Service Center employees Carole Burnworth, Nicole Tyo, and Chris Beatty.

Case No. 3:04CV7056
Gwin, J.

*A. Procedural Standing*

Plaintiffs filed this lawsuit on February 10, 2004.  Plaintiffs sue the Danbury Local School District, the Danbury Board of Education, two Danbury School District officials, two Danbury School District teachers, four Danbury School Board members, the Erie-Huron-Ottawa Educational Service Center, and three Educational Service Center employees.

The plaintiffs' amended complaint seeks damages under the Americans with Disabilities Act, the Rehabilitation Act, the Individuals with Disabilities in Education Act ("IDEA"), and 42 U.S.C. § 1983.  The amended complaint also includes state law claims for breach of contract, negligent and intentional misrepresentation, emotional distress, educational malpractice, educational neglect, breach of fiduciary duty, loss of consortium, and negligence.

Previously, the defendants filed a motion for judgment on the pleadings as to the plaintiffs' original complaint.  On November 1, 2004, this Court issued an Opinion dismissing with prejudice certain claims in the original complaint.  [Doc. 43].  In ruling on the defendants' motion for judgment on the pleadings, the Court dismissed the plaintiffs' claims for negligent misrepresentation, educational malpractice, educational neglect, breach of fiduciary duty, and negligence with prejudice as to all defendants.  The Court dismissed the breach of contract claim with prejudice as to Defendant Danbury Board of Education.  The Court also dismissed the intentional misrepresentation claim with prejudice as to Defendants Danbury Board of Education, Danbury Local School District, and Erie-Huron-Ottawa Educational Service Center.

The plaintiffs filed their amended complaint on November 30, 2004, alleging the same claims as the original complaint.

Case No. 3:04CV7056
Gwin, J.

*B. Factual Background*

     *1. Pre-Fifth Grade*

     Plaintiff Emily Popson is a twelve-year-old girl who suffers from Asperger's Syndrome, an affliction similar to autism.  Plaintiffs John and Priscilla Popson are Emily Popson's grandparents and legal guardians.  Plaintiffs lived in the Danbury School District during the 2000-2001 through 2002-2003 academic years.  During the 2000-2001 academic year, Priscilla Popson home-schooled Emily Popson.  Emily attended Danbury Elementary School during the 2001-2002 and 2002-2003 academic years.  Defendant Valerie Kosa taught Emily Popson both years.

     In December 1999, Emily underwent a Multi-Factored Evaluation ("MFE") to assess her educational needs.  [Pl. Ex. AA].  An MFE team from the Port Clinton schools modified Emily's MFE in February 2000.  *Id*.

     In January 2001, the Popsons met with Danbury Elementary School Principal Halley Leffler to discuss Emily's education.  Previously, Mrs. Popson heard positive reviews of Danbury special education teacher Val Kosa.  Mrs. Popson asked if she could enroll Emily in Kosa's class.  Leffler told Popson that Kosa would not be available to teach Kosa in Spring 2001.  Leffler and Mrs. Popson reached an "amenable decision" that Emily would not enter Danbury at that time, and that the parties would meet later in Spring 2001 to discuss Emily's possible enrollment in Fall 2002.  [P. Popson Dep. at 81].

     Mr. and Mrs. Popson attended an informal meeting with Leffler in Spring 2001.  At that meeting, Mrs. Popson asked if she could enroll Emily at Danbury on a part-time basis to focus on her reading skills.  According to Mrs. Popson, Leffler responded that Danbury did not admit students on a part-time basis.

Case No. 3:04CV7056
Gwin, J.

Mrs. Popson again asked if Kosa could teach Emily.  Leffler said the parties would have another meeting in Fall 2001 to discuss Emily's class placement.

During Summer 2001, the Popsons contacted an attorney to assist them in their interactions with school personnel.  Two weeks before the start of school in Fall 2001, Leffler met with the Popsons again at their place of business.  Defendant Martin Fanning, the Danbury School Superintendent, also attended that meeting.  At the meeting, the school officials agreed to allow Emily to attend Danbury Elementary School on a part-time basis.  [P. Popson Dep. at 94].

*2.  Fifth Grade*

Emily began the school year in Defendant Kosa's fifth grade class.  Kosa used a reward system to help control Emily's behavior.  Although Emily's educational performance was not at a fifth grade level, she made academic and social progress during the 2001-2002 school year.

Sometime after the start of the 2001 school year, Danbury school personnel, including Defendant Fanning, conducted an Individual Education Program ("IEP") meeting regarding Emily Popson.  The Popsons participated in the IEP meeting.

In approximately March 2002, Mrs. Popson requested extended school year services for Emily during Summer 2002.  Mrs. Popson testified that Leffler denied her extended school year request.  The Popsons then requested that an IEP team decide whether to offer extended school year services to Emily. In April 2002, the IEP team denied the request for extended school year services, because Emily was meeting her IEP goals and showed progress.  [Pl. Ex. H].

The Popsons then requested a due process hearing on the denial of extended school year services.

-4-

Case No. 3:04CV7056
Gwin, J.

Before the hearing, the parties agreed to mediate their dispute.  On May 23, 2002, they reached a written settlement agreement.  [Pl. Ex. J].  Mrs. Popson and Defendant Fanning signed the settlement agreement. As part of the settlement, Defendant Danbury Local School District agreed to (1) let Emily use its pool twice a week, (2) provide 1.5 hours of tutoring a week for eight weeks, and (3) pay the Popsons' attorney up to $1,000 in attorney's fees.  The agreement provided that "[i]f the tutor is unable to provide services, due to illness, make-up time will be arranged with the parent." The Popsons "agree[d] that by signing this agreement all issues relating to Emily's education are resolved up to the date of this agreement."

Mrs. Popson expected Defendant Kosa to provide the extended school year tutoring.  However, Mrs. Popson knew that Kosa had an ear condition that might impair her ability to provide the tutoring during Summer 2002.  For that reason, the parties agreed to reschedule any tutoring sessions missed due to illness.  [P. Popson Dep. at 129].

Because of illness, Kosa never contacted the Popsons to schedule a tutoring session with Emily in Summer 2002.  Despite this, the Popsons did not become concerned about the lack of tutoring sessions and did not contact school officials to schedule any sessions.  [P. Popson Dep. at 130-132]. Approximately four weeks before the start of the 2002-2003 academic year, Defendant Fanning learned that Kosa had not tutored Emily and contacted the Popsons to schedule make-up sessions.  Fanning first asked if a teacher's aide could provide the tutoring, and offered two sessions per week for four weeks. Mrs. Popson responded that she wanted a teacher to provide the tutoring, and declined Fanning's offer of twice-weekly sessions.  Mrs. Popson only wanted one session per week.

Fanning arranged for Heather Lenthe, another teacher, to tutor Emily.  [P. Popson Dep. at 135].

Case No. 3:04CV7056
Gwin, J.

Lenthe offered to tutor Emily twice a week for four weeks to provide the eight extended school year sessions required in the May 2002 settlement agreement. Mrs. Popson declined Lenthe's invitation, purportedly because an additional 1.5 hours of tutoring a week would cause Emily "to be burned out." [P. Popson Dep. at 137].

Lenthe tutored Emily on school property. Mrs. Popson has no knowledge of Lenthe's teaching methods. [P. Popson Dep. at 135]. Lenthe and Emily only completed two tutoring sessions. According to Mrs. Popson, the third session ended prematurely when Lenthe and Emily had a disagreement. According to Mrs. Popson, Emily did not like it when Lenthe told her to sit up straight and stop picking her fingernails. Mrs. Popson met with Fanning to discuss Emily's problems in tutoring. After the third session, only one week remained until the start of the school year. Mrs. Popson decided to forego any additional tutoring sessions before school started.

### 3. Sixth Grade

Emily started sixth grade in August 2002. Once again, Kosa taught Emily. The school also assigned Barb Mowry to aid Emily in class. Kosa needed the additional help with Emily because her workload increased from the year before. Kosa and Mrs. Popson spoke on an almost daily basis about Emily's performance. Kosa even relied on Mrs. Popson for suggestions on how to handle Emily's behavior. [Kosa Aff. ¶¶ 4-5]. Mrs. Popson felt that Kosa and Emily had a very warm relationship. [P. Popson Dep. at 164].

Although Emily made academic progress early in sixth grade, Kosa says her behavior deteriorated. Mrs. Popson attributes Emily's deteriorating behavior primarily to Emily's annoyance with other students

Case No. 3:04CV7056
Gwin, J.

in Kosa's class, and Kosa's use of positive and negative reinforcement.  According to Popson, Kosa only used positive reinforcement in Emily's fifth grade year.  [P. Popson Dep. at 150-160].

Mrs. Popson became concerned that school personnel could not sufficiently address Emily's educational needs.  Near August 20, 2002, Mrs. Popson requested an occupational therapy evaluation from school officials.  [Pl. Ex. N].  Leffler told her that the school would perform a full MFE.  *Id.*  Laffler convened an MFE meeting in October 2002.  [Beatty Dep. at 21].  The MFE team, including Laffler, Kosa, and Mowry, signed the revised MFE on October 24, 2002.  [Doc. 72 Ex. C].

Beginning in late September 2002, school personnel began to send Emily home from school due to her behavior.  In October 2002, Kosa started using a ticket system, whereby Kosa would send Emily home after Emily received three tickets for poor behavior.  Kosa implemented the system with Mrs. Popson's knowledge and approval.  [P. Popson Dep. at 170-171].  Kosa says that after she implemented the ticket system, she only had to send Emily home on one occasion.  [Kosa Aff. ¶ 12].

In Fall 2002, Mrs. Popson requested a neurophysical evaluation of Emily by her neuropsychologist, Dr. Patsy Suter.  [P. Popson Dep. at 190].  Mrs. Popson also requested that SERRC personnel observe Emily to offer suggestions on her classroom environment.   In October and November 2002, SERRC representatives observed Emily in class.  SERRC prepared its report in January 2003.  [Pl. Ex. P].  In that report, SERRC recommended that the school consider a sensory diet plan to help improve Emily's behavior.  Although the school incorporated SERRC's comments into Emily's behavioral program, school personnel apparently did not provide a full sensory diet program for Emily during the 2002-2003 academic year.  [Beatty Dep. at 24].  According to Defendant Chris Beatty, a SERRC employee who worked on

-7-

Case No. 3:04CV7056
Gwin, J.

Emily's case, school officials felt the current educational plan adequately addressed Emily's sensory needs.

On December 9, 2002, Kosa learned that the Popsons would no longer send Emily to school. [Kosa Aff. ¶ 12]. Near December 10, 2002, Mrs. Popson began to keep Emily at home because she and Dr. Suter feared that Emily would suffer a "meltdown" at school and throw things at her teachers and classmates. [P. Popson Dep. at 189].

During her time in sixth grade, Emily did not receive notice of two extracurricular activities. One was a camping trip to Mohican State Park. The other was a swimming party. The plaintiffs assert that the school made this omission intentionally. [Doc. 67 at 8]. Leffler testified that Emily did not receive notice of the activities because students received the forms in their morning homeroom classes, and Emily did not attend morning homeroom. [Leffler Dep. at 247]. Mrs. Popson herself testified that she did not know whether the school acted intentionally or unintentionally when it did not give Emily notice of the activities. [P. Popson Dep. at 241].

Emily did not attend school from December 10, 2002 through January 2003. On February 13, 2003, the Popsons attended a meeting with representatives from the school and SERRC. They agreed that Emily should return to school for a seven-day evaluation period. Emily returned to school on February 18, 2003. During the evaluation period, Kosa monitored Emily's behavior.

Kosa says that the evaluation period was cut short because of Emily's behavior. Emily was sent home four times for poor behavior during that period. Fanning says he telephoned the Popsons and asked them to keep Emily home for a day. The Popsons sent Emily back to school the next day, but Kosa again sent Emily home for poor behavior. The Popsons did not return Emily to school.

-8-

Case No. 3:04CV7056
Gwin, J.

In April 2003, SERRC representatives conducted a meeting with school officials to discuss the results of the sensory diet evaluation. [P. Popson Aff. ¶ 7]. Mrs. Popson says that Defendant Leffler told her not to attend the meeting. The defendants say the Popsons chose not to attend.

The Popsons requested another due process hearing regarding Emily's educational program. In May 2003, the parties reached another settlement agreement that "resolve[d] all educational issues heretofore." [Pl. Ex. Y].[2/] Under the second mediation agreement, the school agreed to: (1) pay $6,000 to the Popsons' attorney; (2) pay $300 to Dr. Suter, Emily's neuropsychologist, and $300 to Denise Caruso, an educational consultant the Popsons retained; (3) pay for Emily to attend Bittersweet Horse Farm twice a week for eight weeks during Summer 2003, including transportation; (4) provide 36 hours of Summer tutoring for 1.5 hours a day, three days per week; and (5) let Emily use the school pool three days per week for eight weeks. The parties also agreed that they would incorporate a sensory diet plan into Emily's IEP and that SERRC personnel would participate on Emily's IEP team.

During Summer 2003, Emily only visited the Bittersweet Horse Farm twice. [P. Popson Dep. at 216]. The school made the swimming pool available to Emily, although it is not clear whether Emily made full use of her pool access. *Id.* at 219. The school also made Theo Dunham available to tutor Emily. *Id.* at 216. Emily and Dunham met for approximately 15 hours of tutoring through July 2003. [Dunham Aff. ¶ 8]. Originally, the tutoring took place at the Popson home. Eventually, Dunham began transporting Emily to various non-academic activities, seemingly not related to the tutoring.

Dunham did not have the certification needed to drive students. In late July, Fanning told Dunham

---

[2/]Although the plaintiffs do not provide a signed copy of the agreement, the parties agree that the unsigned settlement agreement attached as plaintiffs' Exhibit Y accurately reflects the terms of the agreement.

Case No. 3:04CV7056
Gwin, J.

that because of liability and insurance concerns, he could not allow Dunham to transport Emily in his car. [Fanning Dep. at 114]. Although Fanning believed the tutoring had intended to focus on reading activities, not field trips, Fanning allowed Dunham to meet Emily at such activities. However, Fanning directed that when Emily and Dunham went on field trips, the Popsons would need to transport Emily to meet Dunham. *Id.* Dunham says that although he offered to be flexible in meeting with Emily for tutoring sessions, the Popsons said their work commitments made it impossible for them to transport Emily to the sessions. [Dunham Aff. ¶ 7]. After that point, Emily did not attend any more sessions with Dunham.

Near August 2003, the Popsons moved out of the Danbury School District. Emily now attends Port Clinton City Schools.

## II. Legal Standard

Summary judgment is appropriate when the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In seeking summary judgment, the moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmoving party's case. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001). A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether the moving party has met this burden, a court must view the facts and draw all inferences in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

-10-

Case No. 3:04CV7056
Gwin, J.

all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is not sufficient for the nonmoving party merely to show that there is some metaphysical doubt as to the material facts. *See id.* Additionally, the Court has no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter essential to adjudication. The dispute must concern facts that, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson*, 477 U.S. at 248. The factual dispute also must be genuine. The facts must be such that if proven at trial a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248. "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)); *see also Celotex*, 477 U.S. at 322.

III.  Analysis

*A. Breach Of Mediation Agreements*

The plaintiffs resolved all of their pending claims relating to Emily Popson's education in the May 2002 and May 2003 mediation agreements. "[W]here a party has taken the benefits and secured the

-11-

Case No. 3:04CV7056
Gwin, J.

advantages of an agreement of compromise or settlement, he will be conclusively estopped from asserting

any claim against that which was released or assured to the other party to such agreement." *Board of*

*Comm'rs v. Samuelson*, 24 Ohio St. 3d 62, 63-64 (1986). The Sixth Circuit follows the same rule. *See*

*Board of Educ. v. Patrick M.*, No. 98-3848, 2000 U.S. App. LEXIS 11869, at *10 (6th Cir. May 24,

2000) ("As a general rule, the settlement of a dispute between the parties renders the case moot.") (citation

omitted). The defendants complied with their obligations under the mediation agreements. The plaintiffs

cannot assert any claims arising before those agreements.

   *1. The May 2002 Agreement*

   In signing the first mediation agreement on May 23, 2002, the Popsons agreed that "by signing this

agreement all issues relating to Emily's education are resolved up to the date of the agreement." [Pl. Ex.

J]. The IDEA provides for such mediation in lieu of a due process hearing. 20 U.S.C. § 1415(e)(1). In

the event of a breach of a mediation agreement, parents may request another due process hearing. *Id.* §

1415(b)(6).

   The May 2002 mediation agreement obligated the Danbury Local School District to (1) offer

twice-weekly swimming sessions to Emily at the school's pool, (2) pay the Popsons' attorney's fees, and

(3) provide 1.5 hours of tutoring once per week for eight weeks. If the tutor became sick, the agreement

required the District to arrange alternative tutoring sessions with the Popsons.

   There is no evidence that the defendants breached their obligations under the May 2002 agreement.

The school made the pool available to Emily. The plaintiffs do not suggest that the school failed to pay the

Popsons' attorney's fees. [P. Popson Dep. at 122-125]. The parties understood that Defendant Kosa

-12-

Case No. 3:04CV7056
Gwin, J.

might be too ill to tutor Emily over the Summer, and so the mediation agreement provided that "make-up time will be arranged with the parent."

When Kosa's illness prevented her form tutoring Emily, Fanning attempted to arrange make-up sessions with Mrs. Popson. Although Emily only attended three such sessions due to her disagreements with the tutor, Fanning attempted to make the tutoring sessions available to her. Fanning and the District thus complied with their obligations under the May 2002 mediation agreement. If the District's performance under the mediation agreement did not satisfy the Popsons, they could have sought another due process hearing under the IDEA. They failed to do so.

### 2. The May 2003 Agreement

The May 2003 mediation agreement obligated the District to (1) pay the Popsons' attorney's fees; (2) pay the fees of Dr. Suter and educational consultant Denise Caruso; (3) consult with Caruso on Emily's sensory diet plan; (4) pay for Emily to attend Bittersweet Horse Farm twice a week for eight weeks, and provide transportation to the farm; (5) agree to Emily's sensory diet plan; (6) incorporate a sensory diet plan into Emily's IEP; (7) provide 36 hours of tutoring, at the rate of 1.5 hours per day, three days per week; (8) allow Emily to access the school's swimming pool; and (9) allow SERRC personnel to participate on Emily's IEP team. [Pl. Ex. Y]. At her deposition, Mrs. Popson could not recall how the defendants breached the May 2003 agreement. [P. Popson Dep. at 214-220]. In their brief, the plaintiffs claim only that the defendants failed to provide all 36 hours of tutoring. The record does not support that assertion.

Theo Dunham was available to tutor Emily. He provided 15 hours of tutoring through July 2003.

-13-

Case No. 3:04CV7056
Gwin, J.

At that point, Fanning instructed Dunham that he could not transport Emily in his car because the District did not have insurance coverage for such an arrangement. Dunham offered to come to the Popson's pizza shop "or anywhere else that they wanted to meet me" to tutor Emily. [Dunham Aff. ¶ 6]. Mrs. Popson declined this invitation to have Dunham meet Emily at some other location. [P. Popson Aff. ¶ 8].

In arguing against summary judgment, the plaintiffs wholly ignore the fact that the May 2003 mediation agreement in no way obligated the District to provide Emily's transportation to the tutoring sessions. That Dunham gratuitously provided such transportation during the first part of the Summer did not obligate the District to provide additional transportation. Through no fault of the defendants, the Popsons simply chose not to transport Emily to any more sessions and chose not to set up some other meeting location for Dunham's sessions with Emily.

The Court grants the defendants' motion for summary judgment on the plaintiffs' breach of contract claim.

## B. IDEA And Ohio Administrative Code Violations

The Popsons settled their claims of alleged IDEA and Ohio Administrative Code violations in the May 2002 and May 2003 settlement agreements. Even in the absence of a settlement agreement, the Popsons' administrative claims largely fail.

### 1. IEP And MFE Requirements

First, the plaintiffs contend that the defendants failed to timely complete an MFE evaluation and an IEP for Emily's sixth grade year. The plaintiffs say that Ohio Admin. Code § 3301-51-06(G)(1)(b) required the District to reevaluate Emily's MFE every three years. The Port Clinton City School District

-14-

Case No. 3:04CV7056
Gwin, J.

completed Emily's first MFE on December 6, 1999. The Port Clinton MFE team reevaluated and

modified Emily's MFE on February 16, 2000. The Danbury MFE team completed another MFE on

October 24, 2002. [Doc. 72 Ex. C]. The plaintiffs' claim regarding the MFE fails because the Danbury

team completed a new MFE within three years of Emily's previous MFE.

The plaintiffs also argue that the District did not complete an "appropriate" IEP for Emily's sixth

grade year. They say that Ohio Admin. Code § 3301-51-07(I)(1) required the District to complete a new

IEP every year. Mrs. Popson actually testified that Emily did have an IEP in sixth grade. [P. Popson Dep.

at 263]. Although the Popsons may not have agreed with every aspect of Emily's IEP, the record indicates

that the school provided an IEP for Emily's sixth grade year.

*2. The April 2002 "IEP Meeting"*

In her affidavit, Mrs. Popson asserts that "[a]t some point in April 2003, SERRC conducted a

meeting to discuss the results of the seven-day observation period and the need for a sensory diet."

[Popson Aff. ¶ 7]. Mrs. Popson further asserts that Leffler instructed the Popsons not to attend the

meeting. The plaintiffs characterize the meeting as an IEP meeting and say that Leffler's conduct violated

Ohio Admin. Code § 3301-51-07(F). That section requires school districts to "take steps to ensure that

one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the

opportunity to participate . . . . " Responding, the defendants say that the Popsons chose not to attend the

meeting.

Assuming Leffler did not permit the Popsons to attend the April 2003 meeting, the record does not

indicate that the meeting was an "IEP meeting." According to Popson, SERRC officials met with school

-15-

Case No. 3:04CV7056
Gwin, J.

officials to discuss the results of the observation period.  The SERRC officials were not members of the IEP

team.  The meeting was not for the purpose of "developing, reviewing, and revising" Emily's IEP.  Ohio

Admin. Code § 3301-51-07(C).

### 3. Extended School Year Services

The plaintiffs say that the defendants "violated the law regarding extended school year services."

The Ohio Administrative Code provides that "[e]xtended school year services must be provided only if the

child's IEP team determines, on an individual basis . . . that the services are necessary for the provision of

[a free appropriate public education] to the child."  Ohio Admin. Code § 3301-51-07(G)(3)(b)(ii).

According to the Popsons, three IEP team members voted against extended school year for Emily, two

members voted for it, and one member abstained.  Given the plaintiffs' admission that the IEP team made

a determination that Emily did not require extended school year services, as the Ohio Administrative Code

contemplates, their claim fails.

### 4. Extracurricular Activities

According to the plaintiffs, the defendants did not meet their legal obligations when they failed to

provide Emily with notice of the field trip to Mohican Park and notice of the sixth grade swimming night.

Both failures occurred before the May 2003 settlement agreement.  The plaintiffs offer evidence that the

failure to provide notice resulted from Emily's unique class schedule, and not from any ill will.

The Ohio Administrative Code requires the District to "take steps to provide non-academic and

extracurricular services and activities in the manner necessary to afford children with disabilities an equal

opportunity for participation in those services and activities."  Ohio Admin. Code § 3301-51-09(A)(5).

-16-

Case No. 3:04CV7056
Gwin, J.

Whether school personnel acted innocently in failing to give Emily notice of the two activities is beside the point. The Popsons settled their claims relating to the extracurricular activities in the May 2003 mediation agreement. If not for that fact, the plaintiffs' claim would survive summary judgment.

### 5. Disclosure Of Personal Information

The plaintiffs say that Leffler disclosed personal information about Emily in violation of the Ohio Administrative Code. The Ohio Administrative Code requires school districts to take steps to "ensure protection of the confidentiality of any personally identifiable information in regards to the collection, storage, disclosure, and destruction of that information." Ohio Admin. Code § 3301-51-04(A). According to the plaintiffs, one day Emily and Kosa ate lunch together. Leffler allegedly joined them and made comments regarding Emily's size and also said Emily had "flunked a few times."

The plaintiffs offer only hearsay in support of their theory. They base their claim on Mrs. Popson's second-hand testimony that a student in Emily's class thought she heard Leffler refer to Emily's size and academic status. [P. Popson Dep. at 266-268]. The plaintiffs even say that Leffler mentioned Emily's battle with Asperger's Syndrome, again relying on Mrs. Popson's deposition. [Doc. 67 at 19]. Yet Mrs. Popson offers no such information in her deposition. The defendants deny that Leffler made any comments about Emily, but instead jokingly referred to Kosa as a large sixth grader when she sat in the lunchroom with her students.

Regardless, Mrs. Popson has no first hand knowledge of what Leffler did or did not say in the school lunchroom. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). She

-17-

Case No. 3:04CV7056
Gwin, J.

knows only what the student told her.  It is well settled that "hearsay evidence cannot be considered on a

motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).  The plaintiffs'

claim for violation of privacy fails.

> *6.  Failure To Provide Compensatory Education After Emily's Tenth Day Of Absence*

The plaintiffs next say that the school failed to provide compensatory education after Emily's tenth

day of absence, as required by Ohio Admin. Code § 3301-51-05(K)(4).  The defendants do not argue

that they provided the required compensatory education.  Instead, the defendants say that the Popsons

settled their dispute over compensatory education in signing the May 2003 mediation agreement.

If not for the May 2003 mediation agreement, the plaintiffs' claim regarding compensatory

education would survive the defendants' motion for summary judgment.  However, because the Popsons

settled all outstanding issues regarding Emily's education with the May 2003 agreement, the compensatory

education claim fails.

> *7.  Improper Disciplinary Methods*

Without citing a single case, statute, or administrative rule, the plaintiffs conclude that Defendant

Kosa's system of giving Emily tickets for bad behavior violated the IDEA.  The plaintiffs' claim fails.  First,

the plaintiffs cannot point to any law that the ticketing system violated.  Second, Mrs. Popson consented

to the ticketing system on Emily's behalf.  [P. Popson Dep. at 170-171].  Her consent prevents the

plaintiffs from challenging the validity of the ticketing system.  *See Dipietro v. Lighthouse Ministries*, No.

04AP-910, 2005 Ohio App. LEXIS 632, at *16 (Feb. 17, 2005) (consent barred plaintiff's claim for

injuries; "it is a fundamental principle of the common law that *volenti non fit injuri* -- to one who is willing,

-18-

Case No. 3:04CV7056
Gwin, J.

no wrong is done") (citation omitted).  Third, the plaintiffs settled their issues relating to Emily's education

in the May 2003 mediation agreement.

*C. Civil Rights Violations*

The plaintiffs make three claims of civil rights violations under 42 U.S.C. § 1983.  First, the plaintiffs

say that Leffler violated Emily's fundamental right to privacy by supposedly discussing her educational

history in the school lunchroom.  Second, the defendants denied the Popsons' due process rights when they

did not allow them to participate in all of Emily's IEP meetings and when they "demanded" that the Popsons

not return Emily to school in sixth grade.  Third, the defendants violated Emily's equal protection and due

process rights by not giving her notice of the Mohican State Park field trip and the sixth grade swimming

party.  The plaintiffs' section 1983 claims fail.

The section 1983 claims fail because they are derivative of Emily's rights under the IDEA.  When

the Popsons settled their educational issues in the May 2002 and May 2003 settlement agreements, their

claims under section 1983 became moot.  *See Patrick M.*, 2000 U.S. App. LEXIS 11869, at *11

(settlement of IDEA claims mooted claims under section 1983 and the Rehabilitation Act).

Additionally, the Court earlier discussed why the plaintiffs' invasion of privacy claim fails for lack

of evidence.  The Court also explained that the plaintiffs' claim regarding the supposed IEP meeting fails

because insufficient evidence shows the school excluded the Popsons from any meeting of the IEP team.

The Court incorporates those findings herein.

Finally, the plaintiffs assert that the defendants intentionally excluded Emily from the field trip and

the swimming party, and that such intentional discrimination constituted an equal protection violation.  [Doc.

-19-

Case No. 3:04CV7056
Gwin, J.

67 at 23].   According to the plaintiffs, "[i]ntentional discrimination is required to establish an equal

protection violation."  *Id.* (citing *Andrew S. v. School Comm.*, 59 F. Supp. 2d 237, 246 (D. Mass.

1999)).   Even so, the plaintiffs offer no evidence whatsoever that school officials intentionally prevented

Emily from going on the field trips.   The plaintiffs cite Fanning's deposition as support, but the cited pages

only indicate that Fanning did not know Emily did not receive notice of the activities.   [Fanning Dep. at

241-242].   Leffler testified that Emily did not receive notice because of her class schedule.   [Leffler Dep.

at 247].   Mrs. Popson herself testified that she did not know whether the school acted intentionally or

unintentionally.   [P. Popson Dep. at 241].

The plaintiffs' section 1983 claims fail.

## D.  Disability Discrimination Under The ADA And The Rehabilitation Act

The plaintiffs' hostile learning environment claim under the ADA and the Rehabilitation Act relates

to the free appropriate public education of a disabled child.   As such, the claim arises under the IDEA.   *See*

*Charlie F. by Neil F. v. Board of Educ.*, 98 F.3d 989, 993 (7th Cir. 1996) (holding that claims based

on acts "with both an educational source and an adverse educational consequence" arise under the IDEA).

As with the section 1983 claims, the May 2002 and May 2003 mediation agreements moot any educational

claims under the ADA and the Rehabilitation Act.   *See Patrick M.*, 2000 U.S. App. LEXIS 11869, at *11

(settlement of IDEA claims mooted claims under section 1983 and the Rehabilitation Act); *Mahon v.*

*Crowell*, 295 F.3d 585, 588-89 (6th Cir. 2002) (noting that although the Rehabilitation Act predates the

ADA, "analyses of claims made under the two acts run roughly parallel").

## E.  Intentional Misrepresentation

-20-

Case No. 3:04CV7056
Gwin, J.

The plaintiffs originally brought claims of both negligent and intentional misrepresentation. The Court previously dismissed the negligent misrepresentation claim. Only the intentional misrepresentation claim against Danbury School Board members Charles Scott, Janice Zura, Dan Dress, and Lori Chura survives. The plaintiffs apparently abandon the intentional misrepresentation claim, having not even mentioned the claim in their brief. It is just as well. The plaintiffs offer no evidence that those defendants made any misrepresentations, much less that they did so intentionally. The intentional misrepresentation claim also fails because the Popsons resolved all issues relating to Emily's education in the May 2002 and May 2003 mediation agreements.

*F.  Intentional Infliction Of Emotional Distress*

The plaintiffs claim that the defendants' actions towards Emily constituted intentional infliction of emotional distress. [Doc. 67 at 25]. To survive summary judgment, the plaintiffs must offer evidence "(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme or outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Garrett v. Fisher Titus Hosp.*, 318 F. Supp. 2d 562, 576 (N.D. Ohio 2004) (quoting *Phung v. Waste Mgmt.*, 71 Ohio St. 3d 408, 410 (1994)). Severe emotional distress exists where "a reasonable person, normally constituted, would be unable to cope adequately with a mental distress engendered by the circumstances of the case." *Smith v. Ameriflora 1992*, 96 Ohio App. 3d 179, 189 (1994) (affirming summary judgment on emotional distress claim). A trial court may determine as a matter of law whether the alleged emotional injury is serious. *Kurtz v. Harcourt Brace Jovanovich, Inc.*, 69 Ohio App. 3d 267, 273 (1990) (affirming summary judgment on emotional distress claim).

-21-

Case No. 3:04CV7056
Gwin, J.

In arguing against summary judgment on the emotional distress claim, the plaintiffs point only to the defendants' behavior before the parties reached the May 2003 mediation agreement. As a result, the plaintiffs resolved the emotional distress claim along with all other issues relating to Emily's education in that agreement. [Pl. Ex. Y].

The emotional distress claim also fails because the plaintiffs do not demonstrate they suffered a serious emotional injury, or that the defendants' conduct was sufficiently outrageous, or that the defendants' conduct proximately caused such an injury. In opposing summary judgment on the emotional distress claim, the plaintiffs offer only the deposition and affidavit testimony of Mrs. Popson to show that the defendants caused emotional injuries. [Doc. 67 at 25-28]. However, a plaintiff "claiming severe and debilitating emotional injury must present some guarantee of genuineness in support of [her] claim, such as expert evidence, to prevent a court from granting summary judgment in favor of the defendant." *Oman v. Advance Auto Parts, Inc.*, 2003 U.S. Dist. LEXIS 20784, at *7 (N.D. Ohio Oct. 28, 2003) (quoting *Knief v. Minnich*, 103 Ohio App. 3d 103, 108 (1995)). A plaintiff's "affidavit or deposition testimony claiming severe emotional distress, such as offered in this case, is insufficient." *Id.* (citing *Oglesby v. City of Columbus*, 2002 Ohio App. LEXIS 3827 (July 25, 2002)). That reasoning eviscerates the plaintiffs' emotional distress claim here.

Finally, the plaintiffs fail to offer any evidence of intent on the part of the defendants. A claim for intentional infliction of emotional distress requires the plaintiff to demonstrate a heightened level of intent:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive

-22-

Case No. 3:04CV7056
Gwin, J.

damages by another tort.

*Sheets v. Rockwell Int'l Corp.*, 68 Ohio App. 3d 345, 354 (1990) (quoting *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 374-75 (1983)).  Instead, the plaintiff must demonstrate conduct that "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.*

Under *Sheets*, the plaintiffs simply offer no evidence that any defendant intended to cause any emotional injury.  The plaintiffs do not demonstrate that the defendants acted with any tortious, criminal, or malicious intent, much less the "utterly intolerable" and "outrageous" attitude required to show intentional infliction of emotional distress.

## G. Loss Of Consortium

Mr. and Mrs. Popson attempt to recover damages for the lost consortium of Emily that  allegedly resulted from the defendants' actions.  Under Ohio law, a familial loss of consortium claim is "'derivative' in that it depends upon a defendant having committed a legally cognizable tort against someone."  *Derungs v. Wal-Mart Stores*, 162 F. Supp. 2d 861, 872 (S.D. Ohio 2001) (granting summary judgment on loss of consortium claim).  Here, as in *Derungs*, this Court grants summary judgment to the defendants on every claim other than the loss of consortium claim.  Consequently, "their loss of consortium claim necessarily fails, as a matter of law."  *Id.*

## H.  Motion To Strike Affidavit Of Carole Burnworth

The plaintiffs filed a motion to strike the affidavit of Defendant Carole Burnworth.  The Court did not consider Ms. Burnworth's affidavit in granting the defendants' motion for summary judgment.  The

Case No. 3:04CV7056
Gwin, J.

Court thus denies the plaintiffs' motion to strike as moot.  *See In re Meridia Prods. Liab. Litig.*, 328 F.

Supp. 2d 791, 808 (N.D. Ohio 2004).

IV.  Conclusion

For the reasons stated above, the Court **GRANTS** the defendants' motion for summary judgment

and **DENIES** the plaintiffs' motion to strike.  This action is hereby terminated pursuant to Fed. R. Civ. P.

58.

IT IS SO ORDERED.


Dated: April 28, 2005                                    s/          *James S. Gwin*
                                                        JAMES S. GWIN
                                                        UNITED STATES DISTRICT JUDGE